**ORAL ARGUMENT NOT SCHEDULED**

## No. 14-1056, 14-1094

𝕴𝕟 𝕥𝕙𝕖

# 𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 𝔆𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰

### 𝔣𝔬𝔯 𝔱𝔥𝔢 𝔇𝔦𝔰𝔱𝔯𝔦𝔠𝔱 𝔬𝔣 𝔆𝔬𝔩𝔲𝔪𝔟𝔦𝔞

_____

Fallbrook Hospital Corporation, doing business as Fallbrook Hospital,
*Petitioner/Cross-Respondent*

v.

National Labor Relations Board,
*Respondent/Cross-Applicant*

**On Appeal from the National Labor Relations Board**

_____

**BRIEF OF PETITIONER**

_____

BRYAN T. CARMODY
CARMODY & CARMODY LLP
134 Evergreen Lane
Glastonbury, Connecticut 06033
(203) 249-9287
(860) 430-9437 (fax)
bryancarmody@bellsouth.net

*Counsel for Petitioner*

Becker Gallagher · Cincinnati, OH · Washington, D.C. · 800.890.5001

# *REVISED* CERTIFICATE AS TO PARTIES, RULINGS AND RELATED CASES[1]

The Undersigned, as Counsel for Fallbrook Hospital Corporation d/b/a Fallbrook Hospital (hereafter, "Fallbrook" or the "Hospital"), the Petitioner in the above-captioned case, whereby Fallbrook has filed a Petition for Review of the Decision and Order officially reported by the Respondent, the National Labor Relations Board (hereafter, the "Board"), at Fallbrook Hospital Corporation d/b/a Fallbrook Hospital, 360 NLRB No. 73 (April 14, 2014), does hereby certify, in accordance with Local Rule 28(a)(1), as follows:

(A)     PARTIES AND *AMICI*:  As part of the proceedings below before the Board, the following parties appeared: (1) the Board's Acting General Counsel, (2) Fallbrook Hospital Corporation d/b/a Fallbrook Hospital, and (3) the California Nurses Association (hereafter, the "Union").  No other party or intervenor or *amicus* appeared before the Board.

In the case now before the Court, there are currently two (2) parties, as follows:

> Petitioner:
>
> Fallbrook Hospital Corporation d/b/a Fallbrook Hospital
> 624 East Elder Street
> Fallbrook, California 92028

---

[1] A Revised Certificate is necessary in order to account for a change to "Related Cases," below.

<u>Respondent</u>:

National Labor Relations Board
Office of the General Counsel
Appellate Court Branch
Linda Dreeben, Esq.
1099 Fourteenth Street, N. W.
Washington, D. C. 20570

(B)    <u>RULINGS UNDER REVIEW</u>:  The rulings at issue as part of the case now before the Court are set forth by <u>Fallbrook Hospital Corporation d/b/a Fallbrook Hospital</u>, 360 NLRB No. 73 (April 14, 2014), whereby the Board concluded that, in the context of the parties' efforts to reach an initial Collective Bargaining Agreement, Fallbrook did not bargain in good faith with the Union.

(C)    <u>RELATED CASES</u>: The Decision and Order now before the Court has not been before the Court, or any other Court, previously.  The related case referenced by the original Certificate, <u>Hospital of Barstow, Inc. d/b/a Barstow Community Hospital v. California Nurses Association / National Nurses Organizing Committee</u>, 9th Cir. Case No. 13-57131, has been dismissed by the Court, which granted the parties' request to voluntarily dismiss the appeal. Fallbrook also submits, respectfully, that given how recent events have narrowed the Statement of the Issues (<u>see</u> fn. 2, below), even under the assumption the case was still pending before the Court, <u>Barstow Community Hospital</u> would no longer qualify as a "related case" for purposes of Local Rule 28(a)(1)(C).

Dated:      Glastonbury, CT
            September 15, 2014

                        Respectfully submitted,

                        BRYAN T. CARMODY, ESQ.

                        /s/ Bryan T. Carmody_____
                        Bryan T. Carmody, Esq.
                        Attorney for Petitioner
                        134 Evergreen Lane
                        Glastonbury, Connecticut 06033
                        (203) 249-9287
                        (860) 430-9437 (fax)
                        bryancarmody@bellsouth.net

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, and Rule 26.1 of the Circuit Rules of the United States Court of Appeals for the District of Columbia Circuit, Fallbrook Hospital Corporation d/b/a Fallbrook Hospital (hereafter, "Fallbrook"), as the Petitioner in the above-captioned case, hereby makes the following disclosures:

1.      Fallbrook is a corporation organized under the laws of the State of Delaware, and operates an acute care healthcare institution in Fallbrook, California.

2.      No parent company as defined in Rule 26.1 of the Circuit Rules of the United States Court of Appeals for the District of Columbia Circuit "controls" Fallbrook.  Instead, Fallbrook Hospital Corporation operates and does business as Fallbrook Hospital.  No publicly traded company owns any of Fallbrook's corporate stock.   For the information of the Court, Community Health Systems, Inc., a publicly-traded holding company with no employees has an ownership interest in a privately-held corporation that, in turn has an ownership interest in the privately-held company that owns Fallbrook's stock.

Dated:      Glastonbury, CT
            April 18, 2014

Respectfully submitted,

BRYAN T. CARMODY, ESQ.

/s/ Bryan T. Carmody
Bryan T. Carmody, Esq.
Attorney for Petitioner
134 Evergreen Lane
Glastonbury, Connecticut 06033
(203) 249-9287
(860) 430-9437 (fax)
bryancarmody@bellsouth.net

## TABLE OF CONTENTS

*REVISED* CERTIFICATE AS TO PARTIES, RULINGS AND RELATED CASES ................................................................................................ i

CORPORATE DISCLOSURE STATEMENT ..................................................... iv

TABLE OF AUTHORITIES .............................................................................. vii

JURISDICTIONAL STATEMENT ...................................................................... 1

*AMENDED* STATEMENT OF THE ISSUES ...................................................... 2

STATUTES AND REGULATIONS .................................................................... 3

STATEMENT OF THE CASE............................................................................. 3

    1.)    Procedural Background ................................................................... 3

    2.)    The Record Developed Before the Board ........................................ 7

SUMMARY OF THE ARGUMENT ................................................................. 12

STANDING .................................................................................................... 13

ARGUMENT .................................................................................................. 13

    1.)    Standard of Review ...................................................................... 13

    2.)    The Record Does Not Support the Majority's Finding That Fallbrook Engaged in "Unusually Aggravated Misconduct" .......... 14

        A.)    The Union's Proposals Before Fallbrook's Proposals............. 15

        B.)    Duration of Two of the Parties' Bargaining Sessions ............. 18

        C.)    The ADOs ........................................................................... 19

    3.)    The Majority's Award Is Unsupported By Any Legal Authority...... 20

4.)   The Majority Provides No Explanation as to *How* Fallbrook's
Conduct "Infected the Core of the Bargaining Process," Such
That the Extraordinary Award of the Union's Negotiating
Expenses Was Necessary ................................................................. 26

CONCLUSION ............................................................................................. 28

CERTIFICATE OF COMPLIANCE..................................................... 29

CERTIFICATE OF SERVICE ............................................................. 30

# TABLE OF AUTHORITIES

**Cases**

Columbia College Chicago,
  2013 WL 1122449 (March 15, 2013) ....................................................16

Erie Brush & Manufacturing Corp.,
  357 NLRB No. 46 (2011) ...................................................................20

Fallbrook Hospital,
  360 NLRB No. 73 (April 14, 2014)................................................ i, 2

Federated Logistics and Operations v. NLRB,
  400 F.3d 920 (D.C. Cir. 2005) .........................................................13

First Student, Inc.,
  359 NLRB No. 12 (2012) ........................................................... 18, 19

Hotel Bel-Air,
  358 NLRB No. 152 (2012) ................................................................20

McCarthy Construction Co.,
  355 NLRB 50 (2010) .........................................................................19

Michigan State Employees Association,
  2013 WL 1282221 (March 27, 2013) ...............................................19

Mike-Sell's Potato Chip Co.,
  360 NLRB No. 28 (2014) ..................................................................20

Peoples Gas Systems, Inc. v. NLRB,
  629 F.2d 35 (D.C. Cir. 1980) ................................................ 13, 15, 27

Pratt Industries, Inc.,
  358 NLRB No. 52 (2012) ..................................................................20

Authorities upon which we chiefly rely are marked with asterisks.

Regency Service Carts, Inc.,
    345 NLRB 671 (2005) ........................................................................14

*Unbelievable, Inc. d/b/a/ Frontier Hotel & Casino,
    318 NLRB 857 (1995) ....................................................... 20, 21, 22, 23, 24, 25

*Unbelievable, Inc. v. NLRB,
    118 F. 3d 795 (D.C. Cir. 1997) ............................................. 13, 20, 21, 22, 23, 25

**Statutes**

29 U.S.C. § 160(e) ..............................................................................1

29 U.S.C. § 160(f) ..............................................................................1

29 U.S.C. §§ 151 ..............................................................................1, 3

# <u>JURISDICTIONAL STATEMENT</u>

Under Section § 10(e) of the National Labor Relations Act, as amended, (hereafter, the "Act"), 29 U.S.C. §§ 151, *et seq*., the National Labor Relations Board possessed the subject matter jurisdiction to issue the Decision and Order dated April 14, 2014, a final order, which is the subject of the Petition for Review and Cross-Application for Enforcement now before the Court.

The Court has appellate jurisdiction pursuant to § 10(e) of the Act, and venue in this Court is proper pursuant to § 10(f) of the Act. <u>See</u> 29 U.S.C. § 160(e); 29 U.S.C. § 160(f).

## *AMENDED* STATEMENT OF THE ISSUES[2]

Fallbrook Hospital Corporation d/b/a Fallbrook Hospital (hereafter, "Fallbrook" or the "Hospital"), as the Petitioner in the above-captioned case, whereby Fallbrook has filed a Petition for Review of the Decision and Order (hereafter, the "Decision") issued by the Respondent, the National Labor Relations Board (hereafter, the "Board"), officially reported at Fallbrook Hospital Corporation d/b/a Fallbrook Hospital, 360 NLRB No. 73 (April 14, 2014), hereby states, by the Hospital's Undersigned Counsel, that the issue raised by Fallbrook's Petition for Review has been narrowed to:

(1)     Whether substantial evidence based upon the record as a whole supports the Board's award of negotiating expenses to the Union.

---

[2] Fallbrook's services are offered through an acute care facility that the Hospital leases from the Fallbrook Healthcare District (hereafter, the "District"). On May 21, 2014, after the Hospital filed its Petition for Review with the Court, Fallbrook provided the District with notice of the Hospital's intention to terminate nearly all core services, as provided for in the lease between Fallbrook and the District. In response, the District solicited bids from other health care providers who may have an interest in substituting for Fallbrook as the lessee. Given the changed circumstances, Fallbrook has decided to abandon all issues presented on appeal, except for the Board's award of negotiating expenses.

## STATUTES AND REGULATIONS

The Court's determination of the issues presented for resolution does not require the study or any statute or regulation.

## STATEMENT OF THE CASE

**1.)    Procedural Background**

Based upon unfair labor practice charges filed by the California Nurses Association (hereafter, the "Union"), on March 6, 2013, the Acting General Counsel (hereafter, for ease of reference, the "General Counsel") issued an Order Consolidating Cases, Consolidated Complaint and Notice of Hearing (hereafter, generally, the "Complaint"), whereby he alleged that Fallbrook Hospital Corporation d/b/a Fallbrook Hospital (hereafter, "Fallbrook" or the "Hospital") violated Section 8(a)(5), and derivatively, Section 8(a)(1) of the National Labor Relations Act, as amended, 29 U.S.C. §§ 151, *et. seq.* (hereafter, the "Act") in the context of Fallbrook's efforts to reach an initial collective bargaining agreement with the Union on the terms and conditions of employment for the Registered Nurses (hereafter, generally, the "RNs") employed by Fallbrook and represented by the Union.  Specifically, the General Counsel alleged that Fallbrook unlawfully (1) demanded receipt of the entirety of the Union's proposals before the Hospital would come forward with any of its proposals, (2) suspended the parties' negotiations based upon the Union's refusal to discontinue RNs' usage of "Assignment Despite Objection" forms (hereafter, "ADOs"), (3) refused to bargain

3

over the termination of two RNs, and (4) refused to provide certain information that related to the termination of RNs.  See Complaint, ¶¶ 8(b), 8(c), 9(a) – 9(d), 10(a), App. at ___.  The Complaint put the Hospital on notice of specific remedies sought by the General Counsel, but did not refer to reimbursement of the Union's negotiating expenses.  See NLRB, Casehandling Manual, Part I, Unfair Labor Practice Proceedings, § 10407.1 ("[t]he complaint should set forth any specific remedies that are in addition to those traditionally granted for the violations alleged").

In response to the Complaint, Fallbrook filed a timely Answer, whereby the Hospital denied the material allegations of the Complaint and set forth a number of affirmative defenses.  Fallbrook later filed an Amended Answer, whereby the Hospital set forth additional affirmative defenses.  In relevant part, Fallbrook averred that (1) the Hospital and the Union had agreed to arbitrate the disputes addressed by the Complaint, and (2) the Hospital had no duty to bargain over the ADOs.  See Amended Answer, ¶¶ 14 and 18, App. at ___.

The Complaint was the subject of a three-day hearing before Administrative Law Judge Eleanor Laws (hereafter, the "Judge") from April 8 to April 10, 2013.  Based upon the Judge's rulings, Fallbrook was not permitted to offer evidence in support of the Hospital's defense that the parties had agreed to arbitrate the disputes that were the subject of the unfair labor practice proceedings.  See

4

Decision, page 13, App. at ___.  Before the record closed, neither the General

Counsel nor the Union alluded to any intention to request reimbursement of the

Union's negotiating expenses as a remedy for any finding that the Hospital had

unlawfully refused to bargain with the Union.  Instead, the request for

reimbursement of the Union's negotiating expenses, as well as reimbursement of

the Union's litigation expenses, surfaced as part of the Union's post-hearing brief

to the Judge.

On May 16, 2013, the Judge issued a Decision in which she found that the

Hospital violated the Act in the ways alleged by the General Counsel.[3]  The Judge,

however, denied the Union's request for negotiating expenses and litigation

expenses.  See Decision, page 15, App. at ___.  In response to the Judge's

Decision, the Hospital and the Union filed Exceptions with the National Labor

Relations Board (hereafter, the "Board").  In Fallbrook's Exceptions, stated

generally, the Hospital objected to the Judge's conclusion that the Hospital

violated the Act, along with most of the factual findings on which her conclusion

was based.  Fallbrook also objected to the rulings whereby the Judge deprived the

Hospital of an opportunity to offer evidence in support of its affirmative defenses.

---

[3] Also on May 16, 2013, the Regional Director for Region 21 of the National Labor
Relations Board filed with the United States District Court for the Southern
District of California a Petition for a Temporary Injunction under Section 10(j) of
the Act.  Case No. 3:13-cv-01159 (GPC).  On June 7, 2013, the Court granted the
Petition, whereupon Fallbrook resumed negotiations with the Union, as directed by
the Court's Order.

In the Union's Exceptions, the Union argued that the Judge should have awarded negotiating expenses, along with litigation expenses.

On April 14, 2014, the Board issued the Decision and Order (hereafter, the "Decision") now before the Court. In the Decision, the Board agreed with the Judge's conclusion that Fallbrook violated Section 8(a)(5) as alleged by the General Counsel. Also in agreement with the Judge, the Board found that the Union had not demonstrated an entitlement to litigation expenses, because, "although found to be without merit, [Fallbrook's] defenses were not frivolous." See Decision, page 1, fn. 3, App. at ___. Unlike the Judge, however, a two-Member majority of the Board believed that the Union should be reimbursed for its negotiating expenses. In justifying the remedy, the majority referred to four (4) events:

> ➢ Fallbrook did not provide any proposals during the first eight (8) bargaining sessions, as the Hospital awaited the entirety of the Union's proposals;

> ➢ Fallbrook ended one of the parties' bargaining sessions abruptly and without explanation, and ended another bargaining session within minutes of arriving;

> ➢ Fallbrook threatened to suspend negotiations to the extent the Union would not agree to discontinue usage of ADOs; and

➢ Fallbrook falsely claimed the parties were at impasse due to the Union's usage of ADOs.

<u>See</u> Decision, pages 2-3, App. at ___.

The Board found that these events showed that Fallbrook "deliberately acted to prevent any meaningful progress during the bargaining sessions that were held." <u>Id.</u>, at page 2, App. at ___.  The Board went on to declare, in the absence of any explanation, that Fallbrook's conduct "infected the core of the bargaining process," so that reimbursement of the Union's negotiating expenses was necessary in order to make the Union whole for the waste of its resources and restore the economic strength the Union previous held at the bargaining table.  <u>Id.</u>, at page 3, App at ___.[4]

**2.)     The Record Developed Before the Board**

On May 16, 2012, based upon a Consent Election Agreement entered into between Fallbrook and the Union, the Board supervised an election, whereby the RNs voted as to whether they wished to be represented by the Union for purposes of collective bargaining.  The Union prevailed in the election, and on May 24,

---

[4] In response to the issuance of the Decision, and given Fallbrook's continued negotiations with the Union, the Regional Director for Region 21 filed a Motion to Dismiss the 10(j) Petition with the U.S. District Court, which granted the Motion on June 11, 2014.  Notwithstanding the dismissal of the District Court's 10(j) Order, Fallbrook has continued negotiations with the Union up to the present day.

2012, the Board issued a Certification of Representative (hereafter, the "Certification") in favor of the Union.  See Certification, App. at ___.

Less than a month later, Fallbrook hosted an introductory meeting with the Union.  Notably, the introductory meeting was held consistent with an agreed-upon framework for negotiations, which was developed by the parties before the election took place and was designed to govern the parties' negotiations toward a collective bargaining agreement.  As part of the framework, the parties also agreed that, to the extent they were unable to resolve any disputes that arose during the course of their negotiations, the dispute would be submitted to a permanent arbitrator who had been mutually selected by the parties.  See Tr. 81, 84, 89, 93, App. at ___.

As part of the introductory meeting, the Hospital introduced its bargaining team to the Union, and similarly, the Union introduced its bargaining team to the Hospital.  The parties then agreed to a number of dates for their negotiations toward a collective bargaining agreement.  The Union also submitted an information request, which was the subject of some follow-up discussion when the parties reconvened on July 3, 2012 for the start of negotiations.  In particular, the Union acknowledged a document production by the Hospital and discussed the need for further documentation.  The Union then submitted roughly thirty (30) proposals, which equated to roughly 90% of the Union's entire set of proposals.  See Tr. 29-32, App. at ___.  Before the bargaining session concluded that day,

8

Fallbrook informed the Union that the Hospital would submit its proposals once the Union had submitted the remainder of its proposals.  The Union argued that the Hospital could not await the entirety of the Union's proposals, but rather, was under a duty to hand over its proposals contemporaneously with the Union's submission of its proposals.  <u>See</u> Tr. 33-34, App. at ___.

The parties met for their second bargaining session on July 17, 2012.  The Union submitted a few more proposals and, as before, Fallbrook advised that its proposals would be forthcoming once the remainder of the Union's proposals were submitted.  The Union again argued that Fallbrook could not await the entirety of the Union's proposals before submitting any of the Hospital's proposals.  <u>See</u> Tr. 35, App. at ___.  The same disagreement was discussed as part of the next bargaining session, which occurred on July 25, 2012.  By that time, the only proposal that the Union had not yet submitted concerned the subject of wages.  As to wages, the Union explained they were in need of some information from the Hospital in order to prepare a proposal.  <u>See</u> Tr. 37-38, App. at ___.

The parties' fourth bargaining session occurred on August 2, 2012.  At that time, the parties reached tentative agreement on three subjects: (1) Fallbrook's recognition of the Union, (2) union security, and (3) retirement benefits.  <u>See</u> Tr. 43, App. at ___.  Notably, the parties' tentative agreements were the outgrowth of an agreement that the parties had reached even before the election took place.

9

Specifically, the parties agreed that, to the extent the Union prevailed in any later election, and the parties would need to negotiate a contract, there would already be in place an agreement on these subjects. <u>See</u> Tr. 46, 81-82, 114, App. at ___.

The parties' next bargaining session occurred on August 22, 2012. That day, the parties' focus was on a new job classification at the Hospital, namely a "Clinical Informaticist" (hereafter, the "Informaticist").[5] The parties also continued to share their divergent views as to whether the Hospital could submit its proposals only upon receipt of the remainder of the Union's proposals, i.e., the Union's wage proposal. <u>See</u> Tr. 48, App. at ___.

The parties' sixth bargaining session occurred on September 12, 2012. In response to the Union's request for more information as to the Informaticist, the Hospital had Ms. Rebecca Ojala, the likely recipient of the position, explain what duties she would carry as the Informaticist. <u>See</u> Tr. 49, App. at ___. The parties' next bargaining session took place on October 11, 2012. By that time, Ms. Ojala had been awarded the Informaticist position, and yet, she also appeared at the October 11th session as part of the Union's bargaining team. Fallbrook explained that the Hospital would not take part in the bargaining session, insofar as Ms. Ojala was a member of the Hospital's own management. <u>See</u> Tr. 50-51, App. at ___. The Union did not state any disagreement with the Hospital's position, nor did the

---

[5] The Informaticist's role was to manage RNs' use of electronic medical records. <u>See</u> Tr. 48, App. at ___.

Union offer to proceed with the bargaining session in Ms. Ojala's absence. A few days later, the Union, by email to Fallbrook's attorney, submitted its wage proposal. <u>See</u> Tr. 51, App. at ___.

The parties' eighth bargaining session occurred on October 18, 2012. At the Union's request, a mediator employed by the Federal Mediation and Conciliation Service (hereafter, "FMCS") attended and managed the parties' bargaining session that day. Consistent with the Hospital's pledge, now that the Union had submitted the entirety of its proposals, Fallbrook began to submit its proposals to the Union. <u>See</u> Tr. 53, App. at ___. At the parties' next bargaining session, the Hospital came forward with additional proposals – fourteen (14), to be precise – and advised that even more proposals would be submitted when the parties met again for negotiations, which occurred on November 30, 2012. At that time, the Hospital submitted another proposal and the Union responded with fourteen (14) counter-proposals. <u>See</u> Tr. 54-55, App. at ___.

On December 28, 2012, Fallbrook and the Hospital had occasion to discuss the ADOs, which are forms prepared by the Union and given to the RNs in order for them to document perceived problems with patient care. As the Hospital had explained to the Union previously (<u>see</u> Tr. 192, App. at ___), the ADOs interfered with the Hospital's own risk management system, which the Hospital obviously saw as a serious issue that could bring about an impasse in the parties'

11

negotiations.  At the parties' next bargaining session, which took place on January

8, 2013, the Hospital advised that the Union's continued distribution of the ADOs

had brought the parties to an impasse.  See Tr. 58-59, 63, App. at ___.

## SUMMARY OF THE ARGUMENT

The award of negotiating expenses is an extraordinary remedy, reserved for

only the most egregious violations of the Act.  In the case now before the Court, in

disagreement with the Judge who presided over the hearing and without the

support of Member Harry Johnson, a two-Member majority awarded the remedy,

nonetheless.  As shown below, however, the majority's finding that the Hospital

engaged in "unusually aggravated misconduct" is not supported by the record.

Furthermore, the award of the remedy is not supported by the case – the one,

solitary case – that was cited by the majority.  Lastly, though the majority declared

that Fallbrook's conduct "infected the core" of the parties' negotiations, the

majority did not offer any explanation as to how Fallbrook's conduct manifested

such an effect.  For these reasons, the Court should deny enforcement of the

Board's award of the Union's negotiating expenses, or at the very least, remand the

proceedings to the Board so that the majority can provide the further, necessary

explanation as to why the extraordinary remedy was appropriate for the case at bar.

12

**STANDING**

There is no dispute that Fallbrook has standing to file the Petition for Review, insofar as the Decision finds the Hospital unlawfully refused to bargain with the Union and directs the Hospital to take remedial action.

**ARGUMENT**

**1.)     Standard of Review**

In order for the award of negotiating expenses to be enforced, the Board's findings of fact must be supported by substantial evidence based upon the record as a whole.  See Unbelievable, Inc. v. NLRB, 118 F. 3d 795, 799 (D.C. Cir. 1997). Additionally, the Court will evaluate whether the Board has "considered the factors which are relevant to its choice of remedy, selected a course which is remedial rather punitive, and chosen a remedy which can fairly be said to effectuate the purposes of the Act." See Peoples Gas Systems, Inc. v. NLRB, 629 F.2d 35, 42 (D.C. Cir. 1980).  Similarly, in the case of the Board's award of an extraordinary remedy, such as the award of negotiating expenses, the agency may be expected to demonstrate a "substantial link" between the extraordinary remedy and the respondent's misconduct.  See Federated Logistics and Operations v. NLRB, 400 F.3d 920, 930 (D.C. Cir. 2005) (Henderson, dissenting).

**2.)     The Record Does Not Support the Majority's Finding That Fallbrook Engaged in "Unusually Aggravated Misconduct"**

The award of negotiating expenses is truly an extraordinary remedy. The Board has ruled and consistently reaffirmed that, for "the **vast majority** of bad faith bargaining violations," the agency will rely upon the conventional remedy of a bargaining order. See Regency Service Carts, Inc., 345 NLRB 671, 676 (2005) (emphasis added). The fact the Hospital's conduct did not warrant the award of the Union's negotiating expenses was so apparent that the General Counsel did not even seek the remedy and the Judge denied the Union's request for the remedy. Nevertheless, without the support of Member Harry Johnson, the two-Member majority singled out Fallbrook for the extraordinary remedy based upon three factors: (1) Fallbrook did not make any proposals until the eighth bargaining session by which point the Union had submitted the entirety of its proposals, (2) the short duration of two of the parties' eleven bargaining sessions, and (3) Fallbrook's suspension of negotiations based upon the Union's refusal to cease distribution of the ADOs. See Decision, pages 2-3, App. at ___. Fallbrook shall address, and debunk, each of these factors, which were referenced by the majority in the absence of any consideration of a variety of other factors that, as shown below, demonstrate that Fallbrook did not engage in any "unusually aggravated misconduct." Put another way, though the Board adopted the Judge's view that Fallbrook's conduct should be assessed based upon the "totality of the

14

circumstances" (see Decision, pages 1, 9, App. at ___), the majority plainly did not undertake any such analysis. Given the majority's failure to consider all of the relevant factors, the award of negotiating expenses should not be enforced. See Peoples Gas Systems, Inc., 629 F.2d at 42.

**A.)     The Union's Proposals Before Fallbrook's Proposals**

The Board's errors here take hold from the very start. Specifically, the Board failed (or refused) to account for the fact that, as for several key subjects of bargaining (e.g., employee benefits, substance abuse, union security), the parties had a "pre-agreement." That is, as noted above, before the election even took place, Fallbrook and the Union agreed that, to the extent the Union prevailed in any later election, and the parties would need to negotiate a contract, there would already be in place an agreement on these subjects. See Tr. 46, 81-82, 114, App. at ___. The Board's hasty finding that the Hospital deliberately sought to prevent any meaningful progress with the negotiations ignores the fact that Fallbrook had reached agreement with the Union on some of the most challenging subjects in virtually any negotiation. Furthermore, the Board ignored the fact that, at the time the negotiations were taking place, the Hospital believed that the negotiations were governed by the parties' framework for bargaining and any disputes would be brought to the parties' arbitrator. The General Counsel's own witnesses acknowledged the existence of the framework (see Tr. 81, App. at ___), and

15

though the Board found the Hospital's arbitration defense to be without merit, the Board also found that the defense was genuine.  See Decision, page 1, fn. 3, App. at ___.  And yet, the Board afforded no weight to the fact that, while the parties' dispute was ultimately brought to the Board for resolution of allegations of statutory violations, at the time the negotiations were taking place, the Hospital's genuine expectation was that the parties' negotiations were governed by a particular set of rules (i.e., the parties' framework for negotiations) that would be applied by a different decision-maker (i.e., a permanent arbitrator fully steeped in the parties' relationship).

In any event, even looking at the case solely through a statutory lens, before the Board issued the Decision in the case at bar, the agency had never clearly held that a party would violate the Act by insisting upon the submission of the other side's proposals before submission of any of the party's proposals.  In other words, Fallbrook's position was not in defiance of "black letter" Board law.  Indeed, as part of the Decision, Member Johnson observed that Fallbrook's position did not reflect any unlawful refusal to bargain.  See Decision, page 1, fn. 2, App. at ___.[6]

---

[6] In a relatively recent case, one of the agency's Administrative Law Judges encountered an employer who engaged in "serious misconduct," based largely on unlawful conditions the employer placed on negotiations.  Even so, the Administrative Law Judge did not believe that reimbursement of the union's negotiating expenses was appropriate and denied the charging party's request for the remedy. See Columbia College Chicago, 2013 WL 1122449, at *58 (March 15, 2013).

16

Lastly, the Board's finding that Fallbrook's position on the Union's proposals revealed some nefarious intent to avoid agreement ignores the fact that, not only had the Hospital already reached agreement with the Union on some of the most combustible, divisive subjects for any collective bargaining agreement, the Hospital already had 90% of the Union's proposals by the parties' very first bargaining session.  See Tr. 31-32, App. at ___.  The record includes no evidence that the Hospital made some attempt to interfere with the Union's ability to prepare the remainder of its proposals.  To the contrary, the record would at least imply that the Hospital provided the information that was necessary for the Union to make a wage proposal.  See Tr. 51, App. at ___.  At any rate, once the Union presented the wage proposal, which rounded out the entirety of its proposals, the Hospital promptly submitted virtually all of its proposals, as promised.  Thus, the record shows that, to the extent the Board believed that Fallbrook locked certain doors in the parties' negotiations, the Union always held the key.  That is, by making proposals, the Union had the power to change the course of the parties' negotiations.  Indeed, precisely at the time the Board perceived that the Hospital was "infecting the core of the bargaining process," the Union distributed a flyer to the RNs that reported "**progress at the bargaining table**."  See Respondent's Ex. 3 (emphasis added), App. at ___.

17

**B.)      Duration of Two of the Parties' Bargaining Sessions**

In total, before negotiations were suspended on account of the Union's refusal to cease distribution of the ADOs, the parties had eleven (11) bargaining sessions during the course of six (6) months. Two of these sessions (roughly, 18% of the parties' negotiating time) are referenced by the Board in the context of the "unusually aggravated misconduct" that warranted reimbursement of the Union's negotiating expenses, at least by the majority's way of thinking. In referring to these bargaining sessions, however, neither the Judge nor the Board acknowledged the fact that, certainly by no later than the October 11th bargaining session, Ms. Ojala was a part of the Hospital's management, and therefore, could not properly participate as part of the Union's bargaining team. See Tr. 48-51, App. at ___. Putting aside the question of whether the Union knew, or should have know, about Ms. Ojala's disqualification before the October 11th bargaining session, neither the General Counsel nor the Union challenged Fallbrook's assertion as to Ms. Ojala's supervisory status. In fact, from that point forward, Ms. Ojala no longer participated on the Union's bargaining team. See Tr. 62, App. at ___.

Moreover, while the Board has frequently encountered employers who walk out of bargaining sessions and / or cancel bargaining sessions as part of a larger pattern of bad faith, the agency has not assessed the extraordinary remedy of negotiating expenses against these employers. See *e.g.*, First Student, Inc., 359

18

NLRB No. 12, Slip Op. at *20-23 (2012); <u>McCarthy Construction Co.</u>, 355 NLRB

50, 58 (2010); <u>Michigan State Employees Association</u>, 2013 WL 1282221, at *45-

48 (March 27, 2013).  In fact, as compared to other cases, and putting aside the

question of whether Fallbrook had good and sufficient reasons for its conduct, the

Hospital's departure from two bargaining sessions is relatively benign.  How, in

these circumstances, the Hospital engaged in "**unusually** aggravated misconduct"

is impossible to fathom.

**C.)    The ADOs**

Fallbrook's business – no, Fallbrook's responsibility, is to provide safe

patient care.  As part of the hearing before the Judge, the Hospital's Risk Manager,

Ms. Linda Maxwell, who is also an RN, explained that the Hospital keeps patients

safe largely through an incident reporting system. <u>See</u> Tr. 409 – 425, App. at ___.

Ms. Maxwell also explained how the ADOs distributed by the Union interfered

with the Hospital's system, and therefore, interfered with the Hospital's ability to

keep patients safe.  <u>See</u> Tr. 426 – 427, App. at ___.

Given the risk to patient care, Fallbrook confronted the Union on the ADOs,

but the Union steadfastly refused to cease distribution of the forms.  <u>See</u> Tr. 187,

App. at ___.  Fallbrook informed the Union that the continued distribution of the

ADOs would lead to an overall impasse in the negotiations.  The fact that the

Board disagreed, and determined that the ADOs did not cause a cognizable

19

impasse in the parties' negotiations, hardly constituted grounds for the Board to

conclude that Fallbrook engaged in "usually aggravated misconduct."  Notably,

though the Board generally looks for the parties to be deadlocked on all open

issues before an impasse has been reached, the Board has also recognized that

some issues, due to their key importance, may alone be sufficient to create an

impasse between the parties.  See Erie Brush & Manufacturing Corp., 357 NLRB

No. 46 (2011).  The Board frequently disagrees with employers who assert that an

impasse has been reached in negotiations[7], but the Board has never responded to

these garden variety circumstances by whacking an employer with the

reimbursement of the union's negotiating expenses.   Here as well, therefore, given

the agency's own, nearly everyday experience, the Board simply cannot establish

that the Hospital engaged in "**unusually** aggravated misconduct."

**3.)      The Majority's Award Is Unsupported By Any Legal Authority**

In terms of legal support, the two-Member majority refers to one case, and

one case only: Unbelievable, Inc. d/b/a Frontier Hotel & Casino, 318 NLRB 857

(1995), enforcement granted in part, Unbelievable, Inc. d/b/a Frontier Hotel &

Casino v. NLRB, 118 F.3d 795 (D.C. Cir. 1997), which was the case in which the

agency defined the standard that should apply to the award of negotiating

expenses.

---

[7] See e.g., Mike-Sell's Potato Chip Co., 360 NLRB No. 28 (2014); Pratt Industries, Inc., 358 NLRB No. 52 (2012); Hotel Bel-Air, 358 NLRB No. 152 (2012).

20

In <u>Unbelievable</u>, the employer had purchased a hotel that had a collective bargaining relationship with two unions. Before the sale, the collective bargaining agreements between the seller and the unions had expired and the seller was in the midst of separate negotiations with each union toward a new collective bargaining agreement. As part of the sale, the new employer (i.e., Unbelievable, Inc.) extended recognition to each union and took over the negotiations. 318 NLRB at 867. Based upon a myriad of factors, the Board found that, through the hire of a new negotiator, the employer engaged in "surface bargaining."[8]

The Board found that the employer's unlawful conduct actually began with "pre-negotiation" conduct. 118 F.3d at 798. Specifically, the Board referred to the fact that, before the employer even informed the unions of its retention of a new negotiator, he (i.e., the new negotiator) contacted the unions repeatedly, procured the involvement of a federal mediator, and presented the unions with a comprehensive set of proposals, which the employer intended to implement unilaterally in roughly thirty days, unless the unions contacted the new "mystery man."[9] 318 NLRB at 857.

The Board was also troubled by the content of, and the message conveyed through, the employer's proposals, which represented major, adverse departures

---

[8] The General Counsel did not allege, and the Board did not find, that Fallbrook engaged in surface bargaining.

[9] The employer's negotiator would later take the position, disingenuously, that the unions refused to contact him. 318 NLRB at 857.

from the employees' existing terms and conditions of employment.  118 F.3d at

798.  To take only a few examples, the employer's proposals demanded a 5% wage

reduction for most of the employees represented by one of the unions, a new

threshold of 2,000 hours worked in order for an employee to be eligible for holiday

or vacation pay, and the removal of visiting privileges for the unions'

representatives.  318 NLRB at 857-858.

The Board referred to some of the negotiator's conduct at the bargaining

table as well.  118 F.3d 795.  In particular, the negotiator refused to discuss the

Union's proposals, and most egregiously, advised that the employer was looking to

provoke a strike so that the employees could be replaced with unrepresented

workers.  318 NLRB at 858.[10]  In connection with one union, three bargaining

sessions after the submission of the negotiator's proposals, the employer declared

an impasse and implemented new terms and conditions of employment, which

included both wage reductions and the loss of the employees' pension plan.  In

connection with the other union, four bargaining sessions after the submission of

the negotiator's proposals, the employer took essentially the same approach.  Id.

The case now before the Court bears no resemblance to Unbelievable, Inc.,

the sole case on which the two-Member majority's award of negotiating expense

---

[10] In a reference to the employer's General Manager, the employer's negotiator
frequently told both unions: "Tom don't care.  Tom would like to have a strike.
Tom would like to get rid of the unions."  318 NLRB at 874.

22

teeters. First and foremost, the General Counsel did not even allege that

Fallbrook's conduct was designed to provoke a strike in order to replace the

striking employees, which was the conduct that the Court believed supported the

agency's finding of "aggravated misconduct" in Unbelievable, Inc.[11]  118 F.3d at

799. Although the negotiations between Fallbrook and the Union sometimes

involved heated exchanges, particularly as concerned the ADOs, the record does

not suggest any conduct at the bargaining table that compares, even remotely, to

what occurred in Unbelievable, Inc.

     In fact, unlike Unbelievable, Inc., Fallbrook's pre-negotiation conduct shows

not only an intent to reach agreement with the Union, but an actual agreement, and

incidentally, on subjects (e.g., employee benefits, substance abuse, union security)

that frequently lead to the most tense and protracted disputes encountered by any

employer and labor organization in negotiating an initial contract. Similarly, by

the testimony of the General Counsel's own witness, the start of the negotiations

was preceded by an introductory meeting at which time the parties agreed to a

number of bargaining sessions and the Union submitted an information request to

---

[11] Unbelievable, Inc. also involved the unlawful termination of an employee, one
of the union's stewards, because of his union support. 318 NLRB at 867, 877.
Though the Board found that Fallbrook should have bargained with the Union as to
two RNs who had been discharged, no allegation was made that either termination
was carried out because of the exercise of their Section 7 rights.

which the Hospital had substantially responded by the time negotiations began on July 3rd.[12] See Tr. 29-31, App. at ___.

The General Counsel also never made the allegation, and clearly the Board did not make any finding to the effect that, through Fallbrook's proposals, the Hospital was seeking to make substantial changes to the employees' existing terms and conditions of employment. Likewise, no claim was made, and certainly no finding was reached that the content of Fallbrook's proposals suggested any bad faith on the part of the Hospital.[13]

Though the Hospital did not come forward with any of its proposals before receipt of the entirety of the Union's proposals, the Board did not find, and here also, the General Counsel did not even allege, that the Hospital refused to consider the Union's proposals. Compare Unbelievable, Inc., 318 NLRB at 858 (employer's negotiator "refused to engage in any meaningful discussion of any of the Union's proposals"). Similarly, notwithstanding Fallbrook's firm position on the ADO, the record does not suggest that the Hospital presented any of its proposals with the message that the Hospital was not open to any changes.

---

[12] To the extent any unseemly pre-negotiation conduct occurred, the Union was the offending party. In particular, before the start of negotiations, the Union began to distribute the ADOs to the RNs. See Tr. 56, 216, 334-35, App. at ___.

[13] The case at bar also lacks any evidence that the Hospital used the FMCS' mediator, who was procured by the Union (see Tr. 53, App. at ___), for any improper purpose. Compare 318 NLRB at 872 (the employer's enlistment of the mediator was "only a disguise" for its bad faith).

Compare Unbelievable, Inc., 318 NLRB at 858 (employer's negotiator informed the union that the employer's proposals would not be modified). Indeed, at the bargaining session on November 30th, the Union submitted ten (10) counter-proposals and the record does not include any evidence that the Hospital expressed any refusal to consider the counter-proposals.

Finally, though the Hospital's declaration of an impasse may bear a limited similarity to Unbelievable, Inc. in that impasse was declared, the surrounding circumstances are, at once, drastically different. To begin with, unlike Unbelievable, Inc., Fallbrook's claim of impasse was based upon an event (i.e., the Union's distribution of the ADOs) that endangered the core of Fallbrook's business.[14] Given what was, at the very least, Fallbrook's good faith concern as to the risk associated with the ADOs, and given the fact that the Board has long recognized that disagreement over a single issue may establish an overall impasse in negotiations, the Hospital's position hardly constitutes "unusually aggravated misconduct." Under the agency's own precedent, the fact that the Board ultimately disagreed with the Hospital's assertion of an impasse does not mean that the Union should be awarded negotiating expenses. See fn. 5, above. Moreover, the obvious

---

[14] One of Fallbrook's witnesses also pointed out that, whereas the documentation generated by the Hospital's risk management system is protected from discovery during civil litigation (for example, malpractice actions), she was concerned that ADOs would not be afforded the same immunity from discovery. See Tr. 411, 428, App. at ___.

purpose of Unbelievable Inc.'s claim of impasse was to implement new, and exceedingly adverse, terms and conditions of employment for the represented employees, after only a few bargaining sessions.  The case now before the Court does not involve any allegation that Fallbrook, which had nearly a dozen bargaining sessions with the Union before negotiations were suspended, implemented any changes to the RNs' terms and conditions of employment or even that the Hospital ever threatened to take such a step.

**4.)   The Majority Provides No Explanation as to *How* Fallbrook's Conduct "Infected the Core of the Bargaining Process," Such That the Extraordinary Award of the Union's Negotiating Expenses Was Necessary**

As part of the award of the Union's negotiating expenses, the Board found that Fallbrook's misconduct "infected the core of the bargaining process to such an extent that its effects cannot be eliminated by the mere application of our traditional remedy of an affirmative bargaining order."  See Decision, page 3, App. at ___.  The majority did not, however, explain ***how*** Fallbrook's conduct "infected the core of the bargaining process."  Put another way, as to the question of causation, the Board simply did not provide any explanation. The Board did not explain how, for example, the core of the parties' negotiations was infected by Fallbrook's request for the entirety of the Union's proposals, where the Hospital had 90% of the Union's proposals by the very first bargaining session and the record does not include any evidence that the Hospital expressed any refusal to

26

consider the Union's proposals. Nor does the majority explain how the core of the parties' negotiations was infected by Fallbrook's position that negotiations should not be taking place with one of its own supervisors (i.e., Ms. Ojala) serving on the Union's bargaining team. Aside from Ms. Ojala's absence, the membership of the Union's bargaining team remained unchanged and continued to attend and participate in the parties' subsequent bargaining sessions. Nor does the majority explain how Fallbrook's position on the ADOs, which had been unilaterally injected into the Hospital's risk management system, would justify the extraordinary award of the Union's negotiating expenses. The fact the Board may have discretion in the selection of a remedy should not relieve the agency, particularly in the case of an award of an extraordinary remedy, to justify how the violation found by the Board leads to the need for the remedy selected by the Board. See Peoples Gas Systems, Inc., 629 F.2d at 42.

Accordingly, to the extent the Court does not deny enforcement of the majority's award of the negotiating expenses for the reasons the Hospital has discussed elsewhere, Fallbrook respectfully requests that the Court remand the case to the Board with a directive that the majority explain how Fallbrook's conduct infected the core of the parties' negotiations.

27

## <u>CONCLUSION</u>

For all the reasons set forth above, Fallbrook respectfully requests that the Court deny enforcement of the Board's award of the Union's negotiating expenses. Alternatively, Fallbrook respectfully requests that the Court remand the case to the Board in order for the agency to explain how the Hospital's conduct infected the core of the parties' negotiations, such that the reimbursement of the Union's negotiating expenses was a necessary remedy.


Dated:         Glastonbury, CT
               September 15, 2014

                         Respectfully submitted,

                         BRYAN T. CARMODY, ESQ.

                         /s/ Bryan T. Carmody
                         Bryan T. Carmody, Esq.
                         Attorney for Petitioner
                         134 Evergreen Lane
                         Glastonbury, Connecticut 06033
                         (203) 249-9287
                         (860) 430-9437 (fax)
                         bryancarmody@bellsouth.net

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

I certify that:

1.     This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 6,423 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii); and

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14 point font size and Times New Roman type style.

/s/ Bryan T. Carmody
Bryan T. Carmody, Esq.
Attorney for Petitioner

Dated: September 15, 2013

29

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 15th day of September, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.


/s/ Bryan T. Carmody
Bryan T. Carmody, Esq.
Attorney for Petitioner